UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KAREN ZEIGER o/b/o D.K.W.[1], | CASE NO. 1:13CV732 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| CAROLYN W. COLVIN[2], COMMISSIONER OF OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Karen Zeigler ("Plaintiff"), acting on behalf of D.K.W., a minor ("Claimant") and her son, seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying Claimant's application for Supplemental Security Income ("SSI"). ECF Dkt. #1.  Plaintiff asserts that the ALJ improperly weighed the medical evidence and erred in finding that Claimant does not meet or medically equal a listing at Step Three.  For the following reasons, the ALJ's decision is AFFIRMED and Plaintiff's case is DISMISSED with prejudice:

**I.    PROCEDURAL HISTORY**

On February 23, 2010, Plaintiff, acting on behalf of Claimant, filed an application for children's SSI, alleging disability beginning August 19, 2001 (Claimant's date of birth) due to Attention Deficit Hyperactivity Disorder, a learning disability, and asthma. ECF Dkt. #11 ("Tr.") at 103-106.  The application was denied initially and on reconsideration. *Id*. at 55-57.

---

[1]*See* L.R. 8.1(a)(2).  The pleadings identify Claimant's middle initial as "V."  However, the medical records reflect that Claimant's middle initial is "K".

[2]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

Plaintiff filed a request for a hearing by an ALJ and on November 8, 2011, an ALJ conducted an administrative hearing *via* video conference, where Plaintiff and Claimant appeared with counsel. Tr. at 33-54. At the hearing, the ALJ accepted testimony from Claimant and Plaintiff. *Id*. On December 12, 2011, the ALJ issued a Notice of Decision - Unfavorable. *Id.* at 8-31. Plaintiff requested review of the ALJ's decision to the Appeals Council, but on February 12, 2013, the Appeals Council denied Plaintiff's request for review. *Id*. at 1-4.

On April 3, 2013, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On June 28, 2013, Plaintiff filed a brief on the merits. ECF Dkt. #14. On August 28, 2013, with leave of Court, Defendant filed a brief on the merits. ECF Dkt. #16. Plaintiff filed a reply brief on September 3, 2013. ECF Dkt. #17.

## II.     **RELEVANT MEDICAL/SCHOOL HISTORY**

### A.     **Hearing testimony**

Claimant was ten years of age on the date of the hearing. Tr. at 37. He testified that he enjoyed playing baseball and video games. Tr. at 38-39. Claimant further testified that he was disruptive in class and had difficulty completing assignments. He fought with other children a couple of times a week. Tr. at 41. Claimant testified that other students picked on him because he attended special education classes. Tr. at 42. His teachers opined that Claimant bottled up his anger and then "explodes." Tr. at 42. Claimant was suspended shortly before the hearing for pulling the fire alarm. Outside of school, he was caught stealing from a local store and vandalizing a neighbor's garage. Even when Claimant took his prescribed medication, he still had difficulty controlling his anger. Tr. at 44. Claimant had a few friends in the neighborhood. They played in the park and in the backyard. Tr. at 47.

Claimant was prescribed a generic form of Ritalin, which he was directed to take three times per day. Tr. at 49. Plaintiff testified that Claimant sometimes took only two doses per day, due to side effects that included stomachaches and headaches. Claimant also suffered from asthma, which was controlled with medication. Tr, at 49-50. Plaintiff testified that Claimant became winded easily and had to use his inhaler. Tr. at 51. Claimant was tutored after school and attended summer school for the last couple of years so he would not be held back.

Plaintiff testified that Claimant was "still hyper" even when he took his medication. Tr. at 53. When Plaintiff was asked the length of time Claimant had been prescribed his current dosage of ADHD medication, Plaintiff responded, "This is his second refill. He has been taking medication for a year back and forth. This is – he tried something else the first time, and then he is trying this medication now, and then this is his – he has been on this for a while." Tr. at 53. Plaintiff testified that representatives from the school had observed that Claimant's behavior improved when he took his medication. Tr. at 53. Plaintiff testified that Claimant was given his medication in the morning before he went to school.

### B. Medical and other evidence

Claimant was eight years of age when Plaintiff applied for child SSI benefits.[3] Plaintiff alleged disability since Plaintiff's date of birth on the basis of ADHD, learning disability, and asthma. Tr. at 127. According to the disability report completed on March 4, 2010, Claimant's only medication was Albuterol for his asthma. Tr. at 128.

Plaintiff also completed a function report that same day in which she indicated that Claimant's only limitation in communication was his inability to repeat stories. Tr. at 116. Otherwise, Claimant was able to communicate with family and friends, he used complex sentences, explained why he did something, and told jokes and riddles accurately. Tr. at 116.

Although Plaintiff asserted that Claimant was hyper and got into trouble at school, she also conceded that he had friends, was able to make new friends, and generally got along with teachers and other adults. Tr. at 119. Additionally, Plaintiff revealed that Claimant was able to take care of his personal needs, including cleaning himself, brushing his hair and teeth, dressing himself, and feeding himself. Tr. at 120. She further reported that Claimant helped around the house and did what he was told most of the time. Tr. at 120.

A few months prior to the second application date, on December 6, 2009, Claimant's teacher, Mary Ann Naughton, referred him for diagnostic testing because he was not making adequate

---

[3]This is Plaintiff's second application for child SSI benefits on Claimant's behalf. Her first application was denied on October 15, 2003. Tr. at 128.

academic progress. Tr. at 262-269. In an Adaptive Functioning Scale Score, completed by Ms. Naughton on December 16, 2009, Claimant scored in the 87th percentile for depressive symptoms, the 97th percentile for social problems, the 97th percentile for attention problems, the 95th percentile for rule-breaking behavior, above the 97th percentile for aggressive behavior, the 90th percentile for affective problems, over the 97th percentile for hyperactivity problems, over the 97th percentile for oppositional defiant problems, and over the 97th percentile for conduct problems. When ranked on his "total problems," Ms. Naughton scored Claimant in the 98th percentile. Tr. 240.

The evaluation team included Ms. Naughton, a speech and language pathologist, and a school psychologist. Tr. at 261. Each member of the team provided their observations of Claimant and/or testing results and an Evaluation Team Report was compiled. Tr. 257-261. Testing revealed that Claimant may require additional time for assignments and evaluations, and would need frequent redirection to stay on task and finish his work. Tr. at 258. Claimant also needed to sit nearest to the site of instruction to ensure that he was listening and following instruction. Tr. at 258.

School psychologist, Donna Yohe, administered the Wechsler Intelligence Scale for Children test on January 27, 2010, and determined that Claimant's intellectual ability was in the "average range." Tr. at 228. Claimant scored a 102 in Verbal Comprehension; 108 in Perceptual Reasoning; 88 in Working Memory; and achieved a full scale score of 102. Tr. at 229. Ms. Yohe concluded that, based on these results, Claimant's intellectual ability would allow him to successfully learn in a regular school environment. Tr. at 228. Ms. Yohe also administered the Woodcock Johnson Test to assess Plaintiff's academic skills. Tr. at 230. Claimant's academic achievement skills were below grade average in reading and writing, and Ms. Yohe recommended remedial instruction and classroom accommodations in those two academic areas. Tr. at 230. Ms. Yohe also noted, however, that Claimant read each statement carefully, took his time in answering the questions, and wanted to be correct in his answers. Tr. at 283. Ms. Yohe opined that Claimant's reading skills were in the low average range. Tr. at 283.

Ms. Yohe evaluated Claimant's social emotional status by examining questionnaire responses from Plaintiff and his current teacher, Ms. Naughton, on the Child Behavior Checklist. Tr. at 236. Although Ms. Naughton indicated that Plaintiff had difficulty obeying the rules and was

disruptive in class. Tr. at 236, she also noted that Plaintiff demonstrated a desire to help her and fellow students with tasks. Tr. at 236. Based on the responses provided by Plaintiff and Ms. Naughton, Ms. Yohe opined that attention deficit and hyperactivity problems were issues impacting Claimant's social emotional status. Tr. at 236.

Speech and Language Pathologist Lydia Rzucidlo assessed Claimant's communication skills using the Clinical Evaluation of Language Fundamentals: Fourth Edition (CELF-4) on February 3, 2010. Tr. at 234-35. Claimant's communication skills were adequate for successful access to the academic curriculum, and Ms. Rzucidlo determined that Claimant did not require specialized educational services to improve his speech and oral language skills. Tr. at 235. Claimant used age-appropriate vocabulary, and his language skills were within normal limits. Tr. at 235.

At the time of his second application, Claimant was in third grade at Joseph Landis Elementary school and had just started taking some special education classes. Tr. at 207. For his first marking period, he received a C in remedial Math, and a B in remedial English. Tr. at 209-210. Claimant also earned C's in Science, Social Studies and Health and a B in Physical Education. Tr. at 210-211. School testing revealed that Plaintiff performed below the third grade level in reading, but he was proficient in English and mathematics. Tr. 275-276.

Claimant received treatment for his asthma from Linda Montgomery, M.D., at University Hospitals. Tr. at 333-341.  On March 16, 2010, Dr. Montgomery indicated that Plaintiff was "open to considering medication" for Claimant's ADHD. Tr. at 333. She recommended that Claimant start a trial of Ritalin. Tr. at 333. There are no further relevant notes or office visits with Dr. Montgomery so it is unclear if Plaintiff started taking Ritalin at that time. During this office visit, Dr. Montgomery noted that Plaintiff was "quiet" and "alert" and was able to answer questions. Tr. at 333.

Consultative examiner, Michael Leach, Ph.D., examined Claimant on June 23, 2010. Tr. at 342-47. Claimant's speech was "100% intelligible" during Dr. Leach's examination, and Claimant had no difficulty understanding directives or expressing himself. Tr. at 345. Plaintiff was neatly dressed and well groomed. Tr. at 343. While Claimant did exhibit some hyperactivity and distractibility, Dr. Leach noted that he consistently put forth a good effort to interact and answered

questions. Tr. at 343. He diagnosed Claimant with ADHD and a Reading Disorder based on his medical records. Tr. at 345.

Dr. Leach noted that Claimant walked to and from school on his own, played in the yard on his own, rode his skate board, played video games and watched TV. Tr. at 344. Dr. Leach also noted that Claimant had a group of friends with whom he routinely socialized. Furthermore, Claimant was able to perform household chores, care for his personal hygiene, and had no difficulty settling down when it was time for bed.

Based on his own clinical observations, Dr. Leach determined that Claimant's functioning was in the average range, which was consistent with his school evaluation. Tr. at 345. Dr. Leach gave Plaintiff a Global Assessment of Functioning ("GAF") score[4] of sixty, which indicates only moderate limitations in social, occupational or school functioning. Dr. Leach determined that Claimant had no impairments in his ability to communicate and in motor development and was only mildly impaired in his cognitive ability due to his reading disorder. Tr. at 345. Dr. Leach further concluded that, due to his ADHD, Claimant was moderately impaired in his social development, personal and behavioral development, and concentration and persistence. Tr. at 346. Dr. Leach noted that Claimant was not taking any medication at all at the time of his examination. Tr. at 343.

On June, 30, 2010, state agency physician John Mormol, M.D., examined the record and determined that, based on the objective medical evidence, Claimant had less than marked limitations in his ability to acquire and use information; attend and complete tasks; interact and relate to others; and care for himself. Tr. at 350-351. He also concluded that Claimant had no limitations in his ability to move and manipulate objects and in his health and physical well-being. Tr. at 351. Dr. Mormol specifically noted that Plaintiff's mother reported that he cleaned his room well with little or no reminders or redirection. Tr. at 350. Furthermore, although Claimant needed questions repeated during his consultative examination, the examiner stated that Claimant was cooperative and

---

[4]The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his/her overall judgment of a person's psychological, social, and occupational functioning on a scale devised by the American Psychiatric Association. Diagnostic & Statistical Manual of Mental Disorders-Text Revision ("DSM-IV-TR") 34 (4th ed. 2000). A GAF score of sixty indicates that an individual has only moderate symptoms or only moderate difficulty in social, occupational, or school functioning. DSM-IV-TR at 34.

consistently put forth a good effort. Tr. at 350. Additionally, even though Claimant reported conflicts with some kids at school, he had a group of friends with whom he regularly socialized. Tr. at 350. State agency psychologist, John Waddell, Ph.D., reviewed the record and concurred with Dr. Mormol's findings. Tr. at 349.

In September of 2010, Claimant's school referred him to Beech Brook for behavioral health counseling and therapy. Tr. at 371-408. Claimant was evaluated and diagnosed with ADHD. Tr. at 392. He met with Crystal Pope, QMHS, once a week. Tr. at 373. At the time of his September evaluation, Claimant's only prescribed medication was Albuterol for his asthma. Tr. at 388. In fact, Ms. Pope noted in her initial September 28, 2010 evaluation that Claimant had been prescribed Concerta, but Plaintiff discontinued the medication after only four days because it made Claimant woozy. Tr. at 392.

In November of 2010, state agency physician, Louis Goorey, M.D., and state agency psychologist, Mel Zwisler, Ph.D., reviewed the medical record evidence and reached the same conclusions – that Claimant had less than marked limitations in his ability to acquire and use information; attend and complete tasks; interact and relate to others; and care for himself. Tr. 361-366.

On May 4, 2011, Ms. Pope noted that Claimant's behavior had not changed. Tr. at 397. Ms. Pope noted that Claimant was still having trouble completing tasks and had poor social interaction, but she also noted that Claimant's family had recently moved and he was forced to transfer to a new school. Tr. at 397.

On May 25, 2011, Plaintiff completed an SSA form updating Plaintiff's information and indicating that he had been taking 5mg of Ritalin three times a day for one year, which was prescribed by Dr. Montgomery. Tr. at 200. On October 17, 2011, Plaintiff's attorney faxed an updated treatment form to the SSA indicating that Dr. Montgomery was going to prescribe new medication to treat Plaintiff's ongoing behavioral problems. Tr. at 203. However, it appears that Plaintiff's mother did not actually seek any new medication for Plaintiff because she testified at the ALJ hearing on November 8, 2011 that Plaintiff was still prescribed the same amount of Ritalin for

his ADHD, that is, three doses, but he was only taking two doses per day due to stomach pain and headaches. Tr. at 49.

Ms. Pope completed a teacher questionnaire on October 24, 2011. Tr. at 216-221. She stated that she treated Claimant at least one hour a week for almost a year. Tr. at 216. She observed that Claimant had serious problems interacting and relating with others and explained that Claimant had been "known to engage in negative behavior due to trying to please his peers." Tr. at 217. She observed that Claimant struggled on a daily basis with expressing anger, seeking attention, and asking permission, and interpreting meaning of facial expression, body language, hints, and sarcasm.

### III. STEPS TO DETERMINE WHETHER CHILD IS ENTITLED TO SSI

In order to qualify for childhood SSI benefits, a claimant must show that he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and that is expected to cause death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.906. An ALJ must proceed through the required sequential steps for evaluating entitlement to childhood SSI. 20 C.F.R. § 416.924(a). The three-step procedure requires the ALJ to determine whether a child:

(1) is performing substantial gainful activity;

(2) has a "severe" impairment or combination of impairments; and

(3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing");

20 C.F.R. § 416.924(a)-(d). In order to *meet* a Listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment. 20 C.F.R. § 416.925(d)(emphasis added). In order to *medically equal* a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment. 20 C.F.R. § 416.926(a) (emphasis added). In order to *functionally equal* a Listing, the child's impairment(s) must be of listing-level severity; *i.e.*, it must result in "marked" limitations in two domains of functioning or

an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a)(emphasis added). The Commissioner assesses all relevant factors, including:

> (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings;
>
> (2) how the child functions in school; and
>
> (3) how the child is affected by his medications or other treatment.

20 C.F.R. § 416.926a(a)(1)- (3). Further, in considering whether a child's impairment functionally equals the Listings, the Commissioner begins by evaluating how a child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b).

The Commissioner considers how a child's functioning is affected during his activities at home, school and in his community in terms of six domains:

> (i) acquiring and using information;
>
> (ii) attending and completing tasks;
>
> (iii) interacting and relating with others;
>
> (iv) moving about and manipulating objects;
>
> (v) caring for yourself; and,
>
> (vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Lengthy definitions for "marked" and "extreme" are set out in § 416.926a(e). "Marked" limitation means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. See § 416.926a(e)(2)(i). "Extreme" limitation is the rating for the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean. See 20 C.F.R § 416.926a(e) (3)(I).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id.*

If the child's impairment meets, medically equals, or functionally equals the Listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

## IV.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## V.   ANALYSIS

Plaintiff advances three arguments in this appeal that are all predicated upon the ALJ's failure to consider the evidence in the record following the agency physician's reports in 2010, particularly Ms. Pope's 2011 teacher questionnaire. First, Plaintiff contends that the ALJ failed to

-10-

give appropriate weight to the 2011 teacher questionnaire. Second, Plaintiff asserts that the ALJ's reliance on the opinions of the agency physicians was misplaced because the agency physicians' opinions pre-dated the 2011 teacher questionnaire. Finally, Plaintiff argues that the ALJ failed to consider whether Claimant meets or medically equals Listing 112.11, captioned "Attention Deficit Hyperactivity Disorder." Plaintiff asserts that the evidence in the record, particularly the 2011 teacher questionnaire, demonstrates that Claimant meets or medically equals the Listing.

The Commissioner argues that the ALJ's decision is supported by substantial evidence, insofar as all of the physicians in the record (the one-time consulting examiner and the four file-reviewing physicians) concluded that Claimant has only moderate limitations caused by his ADHD. Moreover, the Commissioner asserts that there is evidence in the record that Claimant's behavior is controlled with ADHD medication, but that Plaintiff failed to provide the ADHD medication as prescribed.

Insofar as Plaintiff's first and second arguments relate directly to the 2011 teacher questionnaire, they will be addressed together for ease of analysis. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

-11-

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

Finally, evidence from "other sources" may not be used to establish the existence of a medically determinable impairment or given controlling weight, however, the ALJ may use evidence from "other sources" to demonstrate the severity of the claimant's impairments and how it affects the claimant's ability to function. 20 C.F.R. § 404.1513(d)(1); *Cruse v. Comm'r*, 502 F.3d 532, 541 (6th Cir.2007). "Other sources" include nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists. *Id.* When considering opinions from non-medical sources who have seen a plaintiff in a professional capacity, the ALJ should look to several factors, including the opinion's consistency with other evidence, how long the source has known the individual, and how well the source explained his opinion. *Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 820 (N.D.Ohio 2009) (citing *Cruse, supra*, at 541.)

Here, the ALJ "concurr[ed] with the assessments of the state agency physicians" who "opined that [Claimant] has less than marked limitations in the domains of acquiring and using information, in attending and completing tasks, and in interacting and relating to others." Tr. at 16. He also cited the consultative examination performed by Dr. Leach, in which Dr. Leach concluded that Claimant suffered only moderate impairments due to his ADHD. Tr. at 21-22. The ALJ further found that Claimant had less than marked limitations in his ability to care for himself and Claimant had no limitations in his ability to move and manipulate objects and in the domain of health and physical well-being. The ALJ opined that Claimant's behavior was controlled with ADHD medication, but that Claimant was not taking his medication consistently as reflected by the evidence in the record. Tr. at 18, 20.

Addressing Plaintiff's second argument regarding the weight given to the opinions of the agency physicians, the regulations recognize that state agency physicians are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." See 20 C.F.R. §§ 404.1527(e)(2)(i).  Accordingly,  the ALJ did not err in relying upon the opinions of the agency physicians, particularly since they were supported by the results of the consultative examination and other material parts of the record.  Moreover, the opinions of one-time examining and file-reviewing physicians, although never afforded controlling weight, may be given substantial weight where, as here, there is no treating physician.

However, Plaintiff correctly asserts that the ALJ made no reference to the 2011 teacher questionnaire.  Plaintiff also correctly asserts that the 2011 teacher questionnaire was not considered by the consulting examiner or the file-reviewing physicians because it was completed by Ms. Pope after  the physicians examined the record evidence in this case.

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass v. McMahon*, 499 F.3d at 506, 512-13 (th Cir.2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir.1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or, as in this case, the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir.1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. See *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir.2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994) (internal citations omitted).

When considering opinions from non-medical sources who have seen a claimant in a professional capacity, the ALJ should look to several factors, including the opinion's consistency with other evidence, how long the source has known the individual, and how well the source

-13-

explained his opinion. *Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 820 (N.D.Ohio 2009) (citing *Cruse, supra*, at 541.)

Although Ms. Pope had a year-long treating relationship with Claimant, her opinion is clearly at odds with the opinions of the consulting examiner and the file-reviewing physicians. Because the ALJ's decision is supported by substantial evidence in the record, the ALJ did not err in failing to consider the 2011 teacher questionnaire. Accordingly, Plaintiff's first and second arguments, predicated upon the ALJ's failure to consider Ms. Pope's opinion, are not well taken.

Next, Plaintiff contends that the ALJ failed to consider the 2011 teacher questionnaire at Step Three of his analysis, and failed to undertake a proper analysis at Step Three. Plaintiff contends that Claimant meets or equal the Listing 112.11, captioned "Attention Deficit Hyperactivity Disorder," which reads, in its entirety:

> Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented findings of all three of the following:
>
> 1. Marked inattention; and
>
> 2. Marked impulsiveness; and
>
> 3. Marked hyperactivity;
>
> and
>
> B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.
>
> Listing 112.02(B)(2) reads, in its entirety:
>
> For children (age 3 to attainment of age 18), resulting in at least two of the following:
>
> a. Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

-14-

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
>
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
>
> d. Marked difficulties in maintaining concentration, persistence, or pace.

The burden of proof at Step Three of the sequential entitlement to children's social security benefits rests with Plaintiff. *Franklin ex rel. L.F. v. Comm'r of Soc. Sec.*, No. 4:10CV2215, 2012 WL 727799, at *1 (N.D. Ohio Feb. 16, 2012), citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). The ALJ must "nevertheless provide articulation of step three findings that will permit meaningful review of those findings." *Franklin*, citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) and *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011). "As a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Hernandez ex rel. L.A. v. Astrue*, No. 1:10CV1295, 2011 WL 4899960, at *6, citing *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011); *see also Wilson v. Comm'r of Soc.* Sec., 378 F.3d 541, 544-546 (6th Cir. 2004).

The ALJ provided the following analysis in support of his Step Three conclusion that Claimant does not meet or medically equal the severity of one of the listed impairments:

> Although this impairment (Claimant's ADHD) is considered severe under the regulations , it does not medically meet or medically equal the severity requirements of any listed impairment in Appendix 1 to A subpart P of Regulation Number 4.

Tr. at 15.

In *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411 (6th Cir. 2011), the Sixth Circuit Court of Appeals reversed and remanded the case when the ALJ found that the claimant had severe physical and mental impairments at Step Two of the sequential analysis but failed to analyze the claimant's back impairment at Step Three despite concluding that his back impairment had failed to meet or equal a Listing. The Sixth Circuit noted that while the ALJ had thoroughly addressed the claimant's severe mental impairments in his Step Three analysis, " '[n]o

analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe 'back pain' impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not." *Id.* at 415.  The Sixth Circuit wrote:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416 [citations omitted].

However, an ALJ's failure to explain how he reached his Step Three meets or equals conclusion can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner. *See Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011).   Here, there is substantial evidence that supports the ALJ's conclusion that Claimant's suffered no marked impairments and, as a consequence, his ADHD neither meets nor equals the ADHD listing.  In fact, the agency physicians reached the same conclusion.  Tr. at 248, 361. As previously stated, the regulations permit the ALJ to rely upon the conclusions of the agency physicians. See 20 C.F.R. §§ 404.1527(e)(2)(i).  Accordingly, Plaintiff's final argument predicated upon the insufficiency of the ALJ's Step Three analysis does not have merit.

## **VII.   CONCLUSION**

For the foregoing reasons, the ALJ's decision is AFFIRMED and Plaintiff's case is DISMISSED with prejudice.

**IT IS SO ORDERED.**

DATE: September 8, 2014                                */s/George J. Limbert*
                                                                        GEORGE J. LIMBERT
                                                                        UNITED STATES MAGISTRATE JUDGE